[Docket No. 32]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

|  |  |
|---|---|
| JAMAR SPENCER, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CAMPBELL SOUP COMPANY,<br><br>Defendant. | Civil No. 24-9882<br>(RMB/SAK)<br><br><br>**OPINION** |

**APPEARANCES:**

SIRI & GLIMSTAD, LLP
Oren Faircloth, Esq.
Jack Ryan Spitz, Esq.
745 Fifth Avenue, Suite 500
New York, New York 10151

   *Attorneys for Plaintiff Jamar Spencer and the Proposed Class.*

GOODWIN PROCTER, LLP
James W. McGarry
100 Northern Avenue
Boston, Massachusetts 02210

   *Attorney for Defendant Campbell Soup Co.*

## **Table of Contents**

I.    INTRODUCTION...............................................................................................4

II.   FACTUAL BACKGROUND.............................................................................5

    A. The Parties to the Action ................................................................................5

        i.     Plaintiff ................................................................................................5

        ii.    Defendant ............................................................................................5

    B.  The Plan.......................................................................................................6

    C.  Plaintiff's Complaint....................................................................................7

        i.     Count I: The Plan Imposes an Unlawful Tobacco Surcharge .....8

        ii.    Count II: The Plan Fails to Provide Proper Notice ....................8

        iii.   Count III: Defendant Owed and Breached Fiduciary Duties ......9

III.  PROCEDURAL HISTORY.................................................................................9

IV.  LEGAL STANDARD .......................................................................................10

    A. FRCP 12(b)(1) ............................................................................................10

    B.  FRCP 12(b)(6) ..........................................................................................11

    C.  Motions Under Both FRCP 12(b)(1) and 12(b)(6) Require Well-Pled Factual Allegations ...................................................................................12

V.   DISCUSSION....................................................................................................12

    A. Plaintiff Does Not Have Article III Standing.................................................12

        i.     Count I: Plaintiff Lacks Standing ................................................18

            a.  Injury in Fact...........................................................................19

            b.  Traceability and Redressability .............................................19

        ii.    Count II: Plaintiff Lacks Standing...............................................23

    B. Plaintiff's Complaint Fails to State a Claim.......................................24

        i.     Statutory Background ...................................................................25

            a.  Prohibiting Discrimination Based on Health-Status Factors 25

            b.  Fiduciary Duties Under ERISA .........................................28

        ii.    Regulatory Background ...............................................................29

            a.  The 2006 Regulations ...........................................................29

            b.  The ACA Substantially Adopted the 2006 Regulations .......34

            c.  The 2013 Regulations .........................................................34

        iii.   The Statutory and Regulatory Framework Governing ERISA Wellness Programs ......................................................................36

        iv.   Count I Fails to State a Claim......................................................40

            a.  The Plain Meaning of the Statutory Text Supports Defendant's Reading ............................................................40

            b.  The Regulations Do Not Support a Contrary Reading ........46

               1.  Preambles Lack the Force of Law ..............................47

               2.  DOL's Interpretation of the 2013 Regulations Based on the Preamble Would Not Enjoy Deference ....................47

               3.  Even if the Preamble Were Part of the 2013 Regulations, They Would Not Enjoy Deference Under *Loper Bright* ...50

        v.    Count II Fails to State a Claim ...............................................52

vi.      Count III Fails to State a Claim .................................................53
VI.    CONCLUSION ....................................................................................54

**RENÉE MARIE BUMB, Chief United States District Judge:**

## I.   INTRODUCTION

The Employee Retirement Income Security Act ("ERISA") generally prohibits employers from discriminating against employees by charging higher health insurance premiums based on health-status factors such as tobacco use. Congress, however, created an exception that permits employers to impose tobacco surcharges if they offer a wellness program that provides, in relevant part, a reasonable alternative standard––such as a tobacco-cessation course. Plaintiff Jamar Spencer brings this action against his former employer, Campbell Soup Company ("Campbell" or "Defendant"), alleging that Defendant's health plan (the "Plan") violates ERISA because its tobacco-cessation course, Quit for Life, does not fully reward participants with retroactive reimbursement of previously paid tobacco surcharges.[1]

In 2024, Defendant added tobacco surcharges to Plaintiff's health insurance premiums—surcharges Plaintiff could have avoided, albeit not retroactively, by participating in Quit for Life. Plaintiff, however, does not allege that he completed, enrolled in, attempted to enroll in, or even intended to enroll in Quit for Life. Nor

---

[1] When Plaintiff filed his Complaint on October 17, 2024, Defendant was known as "Campbell Soup Company." However, on November 19, 2024, the Company rebranded as "The Campbell's Company." *See* Press Release, The Campbell's Co., *Shareholders Overwhelmingly Approve the Change in Company Name to The Campbell's Company at Annual Meeting* (Nov. 19, 2024), https://www.thecampbellscompany.com/newsroom/press-releases/shareholders-overwhelmingly-approve-the-change-in-company-name-to-the-campbells-company-at-annual-meeting/. For purposes of this Opinion, the Court relies upon the caption included in Plaintiff's Complaint. Accordingly, Defendant is here referred to as Campbell Soup Company.

does he allege that he would have enrolled in Quit for Life had the wellness program retroactively reimbursed previously paid tobacco surcharges or offered participants a way to avoid such surcharges for the whole Plan year.

Defendant now moves to dismiss the Complaint on two grounds: first, pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction because Plaintiff does not have Article III standing, and second, pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim because the Plan complies with ERISA's requirements.  For the reasons set forth in this Opinion, the Motions are **GRANTED** in their entirety.

## II.    FACTUAL BACKGROUND

### A. <u>The Parties to the Action</u>

#### i.  Plaintiff

Plaintiff is a Kentucky resident who worked for Defendant's subsidiary, Snyders-Lance, Inc., when he paid the weekly tobacco surcharge in 2024.  [Docket No. 1, ¶¶ 5, 7.]  Plaintiff does not allege when his employment with Snyders-Lance began and ended.

#### ii.  Defendant

Defendant, a publicly traded corporation headquartered in Camden, New Jersey, produces and markets canned soups and other foods and beverages, which it distributes throughout the United States and internationally.  [*Id.* ¶ 9.]  Defendant

markets under multiple well-known brands, including Campbell's, Pepperidge Farm, V8, Swanson, and Prego.  [*Id.*]

## B.  The Plan

Defendant sponsors, maintains, and manages the Plan, which is governed by ERISA's statutory requirements.  [*Id.* ¶ 10.]  Under the terms of its Plan, Defendant imposes a tobacco surcharge on employees who are enrolled in the Plan and have used tobacco products (including e-cigarettes, cigarettes, cigars, and smokeless tobacco) in the preceding twelve months.  [*Id.* ¶ 17.]  Defendant requires employees to note their own tobacco usage within that twelve-month timeframe, as well as the tobacco usage of any enrolled spouses or domestic partners.  [*Id.* ¶ 16.]  In 2024, Defendant charged those employees a $12.50 weekly surcharge, totaling $650 annually.  [*Id.* ¶¶ 16–17.]  Defendant commingled these surcharge monies with its own assets and did not use a trust account.  [*Id.* ¶ 18.]

Defendant offers its employees the opportunity to avoid tobacco surcharges through its Quit for Life tobacco-cessation course—which is part of its wellness program.[2]  [*Id.* ¶ 24.]  Quit for Life helps enrollees and eligible family members stop

---

[2] To clearly distinguish Defendant's "tobacco-free wellness program" (the outcome-based, health-contingent wellness program) from Quit for Life (the reasonable alternative standard available under this wellness program), the Court's Opinion refers to Quit for Life as a "course" and not as a "program."  [*See* Docket No. 32-1, at 15–16.]  Here, for example, Defendant's wellness program allows employees to obtain lower premiums (1) if they do not use tobacco or (2) if they satisfy the reasonable alternative standard by completing the free tobacco-cessation course: Quit for Life.  [*See id.*]

using tobacco products.  [*Id.*]  The course is free, including the cost of nicotine patches and gum.  [*Id.*]  Participants complete the course after finishing five calls with the Quit for Life team.   [*Id.*]   The course conditions completion only on participation and satisfaction of the applicable requirements, not permanent abstinence from tobacco use.  [*Id.*]  The 2024 Summary Plan Description provides:

> The Quit for Life Program . . . is designed to help you and your eligible family members stop using tobacco products. The Program, including the cost of nicotine patches and gum, is provided at no additional cost to you or your family. The tobacco surcharge, which is applied for any covered employee or spouse/domestic partner who is a tobacco user, *will be removed on a go-forward basis if and only if the Quit for Life Program is completed* by all covered tobacco users during the program year. Participants complete the program when they complete five calls with the Quit for Life team.

[*Id.* (emphasis added).]

### C. Plaintiff's Complaint

On October 17, 2024, Plaintiff filed this class action challenging Defendant's wellness program under ERISA.  [*Id.* ¶ 4.]  Plaintiff brings the suit individually and on behalf of all similarly situated  Plan participants and beneficiaries, seeking recovery for allegedly unlawful tobacco surcharges along with equitable relief redressing Defendant's alleged violation of ERISA's anti-discrimination provisions.  [*Id.* ¶ 6.] Nowhere in his Complaint, however, does Plaintiff allege that he used tobacco products—although it is reasonable to infer that he did.

Moreover, Plaintiff does not allege in the Complaint that he completed, enrolled in, attempted to enroll in, or even intended to enroll in Quit for Life.  Nor does he allege that he would have enrolled had Defendant's tobacco-free wellness program

7

provided retroactive reimbursement of previously paid tobacco surcharges upon completion of Quit for Life or otherwise allowed participants to avoid tobacco surcharges for the entire Plan year.  Likewise, Plaintiff does not allege that Defendant's allegedly deficient notice prevented him from enrolling in Quit for Life.

### i.  Count I: The Plan Imposes an Unlawful Tobacco Surcharge

Specifically, in Count I, Plaintiff alleges that the tobacco surcharge was unlawful because ERISA mandates retroactive reimbursement of previously paid tobacco surcharges upon completion of Quit for Life.  [*Id.* ¶ 24.]  That alleged defect, Plaintiff submits, renders Defendant's tobacco-free wellness program noncompliant, and, in turn, the imposition of the tobacco surcharges discriminatory.  [*Id.* ¶¶ 24–25.]  In Plaintiff's view, the entire Plan is unlawful because of this defect.  [*Id.* ¶ 4.]  To support his position, Plaintiff principally relies upon the following ERISA statutory language: "[the] *full reward* under the wellness program shall be made available to all similarly situated individuals."  [*Id.* ¶ 25 (referencing 42 U.S.C. § 300gg-4(3)(D) (emphasis added).]  Plaintiff contends that the statutory phrase "full reward" compels plan sponsors like Defendant to reimburse tobacco users for *all* tobacco surcharges previously paid, thereby placing them on *equal footing* with non-tobacco users for the *entire Plan year*.  [*Id.* ¶ 20.]

### ii.  Count II: The Plan Fails to Provide Proper Notice

In Count II, Plaintiff alleges that the Plan fails to provide the statutorily required notice in several respects.  First, Plaintiff alleges that Defendant provided inadequate

notice of a compliant tobacco-free wellness program, *i.e.*, one that provides for retroactive reimbursement upon completion of the reasonable alternative standard, by failing to notify employees of its availability in all Plan materials describing the terms of the wellness program.  [*Id.* ¶¶ 30–32.]  Second, Plaintiff contends that Defendant provided inadequate notice by failing to disclose that personal physician recommendations would be accommodated upon request.  [*Id.* ¶ 33.]

### iii.  Count III: Defendant Owed and Breached Fiduciary Duties

In Count III, Plaintiff asserts that Defendant was a fiduciary who owed and breached its duties under ERISA by, among other things, administering a plan that did not conform with ERISA's anti-discrimination requirements.  [*Id.* ¶¶ 65–67.]  Plaintiff also alleges a series of related violations, including Defendant's purported failure to act in the sole interest of plan participants, 29 U.S.C. § 1104(a)(1)(A);  Defendant's administration of an allegedly non-compliant benefits plan, 29 U.S.C. § 1104(a)(1)(D); and Defendant's action on behalf of a party whose interests are averse to the plan's interests, 29 U.S.C. § 1106(b)(2).  [*Id.* ¶ 68.]

## III.  PROCEDURAL HISTORY

On December 4, 2024, Defendant filed a pre-motion letter pursuant to Rule I.A. of this Court's Individual Rules and Procedures expressing its intention to move to dismiss the Complaint.  [Docket No. 17.]  After Plaintiff submitted his letter in opposition, the Court held a pre-motion conference on January 7, 2025.  [Docket No. 23.]  Defendant filed its pending Motion to Dismiss under Federal Rules of Civil

Procedure 12(b)(1) and 12(b)(6). [Docket No. 32.] Plaintiff timely responded on March 11, 2025. [Docket No. 33.]

On September 16, 2025, after reviewing notices of supplemental authority submitted by the parties, the Court filed a letter order administratively terminating Defendant's Motion to Dismiss pending completion of supplemental briefing. [Docket No. 46.] Specifically, the Court asked Defendant to submit supplemental briefing addressing (1) the impact of various district court decisions dealing with tobacco surcharges on the Court's resolution of Plaintiff's case; and (2) whether *McLaughlin Chiropractic Assocs. v. McKesson Corp.*, 606 U.S. 146 (2025), requires the Court to disregard the 2013 Regulations as inconsistent with ERISA. [*Id.*] Defendant filed supplemental briefing on October 1, 2025. [Docket No. 47.] Plaintiff timely responded on October 10, 2025. [Docket No. 50.] Both parties have since submitted additional letters of supplemental authority. [*See generally* Docket Nos. 54, 57, 58, 59, 61, 62, 66.]

The matter is now ripe for this Court's adjudication of Defendant's Motions to Dismiss.

## IV. LEGAL STANDARD

### A. FRCP 12(b)(1)

A district court entertaining a Rule 12(b)(1) motion must first determine whether it "presents a 'facial' attack or a 'factual' attack on the claim at issue," as that distinction governs the nature of the court's review. *Long v. Se. Pa. Transp. Auth.*, 903 F.3d 312, 320 (3d Cir. 2018) (citing *Constitution Party of Pa. v. Aichele*, 757 F.3d 347,

357 (3d Cir. 2014)). When there is a facial attack on a claim, a district court "must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012) (quoting *Gould Elec. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000)). On the other hand, if the defendant contests the truth of the jurisdictional allegations, there is a factual attack, and the district court must permit the plaintiff the opportunity to respond with evidence to support jurisdiction. *Long*, 903 F.3d at 320 (citing *Constitution Party of Pa.*, 757 F.3d at 358); *Schuchardt v. President of the U.S.*, 839 F.3d 336, 343 (3d Cir. 2016)). Here, because there is no dispute as to the truth of the jurisdictional allegations, the Court construes Defendant's Motion to Dismiss as a facial attack on its jurisdiction.

## B. FRCP 12(b)(6)

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint. Courts will dismiss a complaint under Rule 12(b)(6) if the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

11

C. **Motions Under Both FRCP 12(b)(1) and FRCP 12(b)(6) Require Well-Pled Factual Allegations**

In deciding both a motion to dismiss that is a facial attack on the court's subject matter jurisdiction and a motion to dismiss for failure to state a claim, the court must apply the same standard. It may accept only well-pled facts and not conclusory legal conclusions. *Schuchardt*, 839 F.3d at 344 ("[T]o survive a motion to dismiss for lack of standing, a plaintiff must allege facts that affirmatively and plausibly suggest that [he] has standing to sue . . . [t]hat is, the plaintiff must plausibly allege facts establishing each constitutional requirement.") (internal quotation marks omitted); *see also Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 789–90 (3d Cir. 2016) (explaining in the context of a motion to dismiss under FRCP 12(b)(6) that "merely conclusory" legal assertions are not entitled the presumption of truth). A district court's role in reviewing the sufficiency of a complaint is thus limited: the issue is not "whether the plaintiffs will ultimately prevail" but "whether they are entitled to offer evidence to support their claims." *Langford v. City of Atlantic City*, 235 F.3d 845, 847 (3d Cir. 2000). Courts will not accept "legal conclusions" as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

With these principles in mind, the Court turns to each Motion.

V. **DISCUSSION**

A. **Plaintiff Does Not Have Article III Standing**

12

Because it is a jurisdictional requirement, the Court must first determine whether Plaintiff has Article III standing to bring his claims. *Associated Builders & Contractors W. Pa. v. Cmty. Coll. of Allegheny Cnty.*, 81 F.4th 279, 286–87 (3d Cir. 2023). Article III standing requires a plaintiff to demonstrate three elements: "'(1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief.'" *Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 152 (3d Cir. 2022).[3] It is the plaintiff who bears the burden of establishing each element of his standing to sue under Article III. *Schuchardt*, 839 F.3d at 343–44.

Because Plaintiff's Article III standing turns on the sufficiency of the allegations contained in Counts I and II of the Complaint, the Court must scrutinize them consistent with *Twombly* and *Iqbal*. In Count I, Defendant contends that Plaintiff lacks standing to bring his retroactive reimbursement claim because he never completed, enrolled in, attempted to enroll in, or even intended to enroll in Quit for Life. [Docket No. 32-1, at 19–20.] According to Defendant, if Plaintiff is correct that ERISA requires retroactive reimbursement, the injury for Article III purposes would be his failure to obtain retroactive reimbursement *after* completing Quit for Life—not his mere payment of a weekly surcharge for being a tobacco user. [*Id.*] Because Plaintiff does not allege that he completed, much less enrolled in the course, Defendant argues

---

[3] The Court does not separately analyze Article III standing with respect to Plaintiff's Count III claims because it summarily resolves the merits of those claims below based on the Plan's compliance with ERISA.

that Plaintiff lacks standing and is simply asserting the generalized grievance of a hypothetical employee. [*Id.*]

Plaintiff accuses Defendant of mischaracterizing the nature of his injury. Far from asserting a mere "generalized grievance," Plaintiff claims that his weekly payment of an allegedly unlawful surcharge constitutes an injury in fact on its own. [Docket No. 33, at 23–24.] In essence, Plaintiff's claim is that because Defendant offered no wellness program with a compliant reasonable alternative standard, it could not impose a surcharge in the first place.

The parties' disputes regarding the nature of Plaintiff's allegations are hardly surprising. The Complaint consists mostly of statutory recitations and legal conclusions with very few well-pled factual allegations. More vexingly, the Complaint conflates distinct legal theories relevant to the merits. For instance, the Complaint suggests that participants who complete Quit for Life are entitled to retroactive reimbursement of previously paid tobacco surcharges *and* that a compliant wellness program must provide participants with a means of avoiding any tobacco surcharges for the entire Plan year. [Docket No. 1, ¶¶ 24–25, 29.] The Complaint seems to assume that the former proposition necessarily establishes the latter, but they are in fact analytically distinct, as will be demonstrated below.

The Court understands Plaintiff's theory of the case (Count I) to proceed by the following syllogism: (1) ERISA only permits a plan sponsor to levy tobacco surcharges if it provides a wellness program with a compliant reasonable alternative standard for those who cannot meet the tobacco-free baseline; (2) a wellness program

14

that does not reward enrollees who complete the reasonable alternative standard by retroactively reimbursing them for previously paid surcharges does not satisfy the "full reward" requirement and, therefore, fails to provide a compliant reasonable alternative standard; (3) because there is no wellness program with a compliant reasonable alternative standard, the plan sponsor's imposition of tobacco surcharges is discriminatory. Plaintiff repeatedly alleges that Defendant failed to provide a compliant reasonable alternative standard and, therefore, a lawful plan under ERISA. [*Id.* ¶¶ 4, 5, 20, 23, 24, 29, 47, 48, 49, 50.] The following paragraphs in the Complaint are illustrative:

- "Defendant failed to provide a compliant wellness program for tobacco-using participants." [*Id.* ¶ 20.]

- "Defendant's tobacco surcharge program did not and does not satisfy the requirements that it provide a reasonable alternative standard, or that it provide notice of a reasonable and alternative standard." [*Id.* ¶ 23.]

- "Because the Plan fails to provide a compliant reasonable alternative standard . . . Defendant's wellness program fails to provide reasonable alternative standards." [*Id.* ¶ 29.]

- "Defendant improperly imposes a tobacco surcharge on all participants who use tobacco in violation of ERISA § 702." [*Id.* ¶ 48.]

- "Because the Plan imposes a discriminatory surcharge on tobacco users, without offering a compliant wellness program, Defendant discriminates against individuals like Plaintiff who use tobacco products." [*Id.* ¶ 49.]

- "Further, Defendant's failure to provide a reasonable alternative standard to the smoking cessation program it offers to participants constitutes a failure by Defendant to provide participants with a compliant wellness program." [*Id.* ¶ 50.]

15

These allegations, however, are conclusory legal assertions, not well-pled factual contentions. [*Id.* ¶¶ 24–25.] Factually speaking, the parties do not dispute that Defendant offered Quit for Life, a reasonable alternative standard. [*Id.* ¶ 3 ("This reasonable alternative could include participation in a smoking cessation program . . ..").] That the Plan failed to provide a *compliant* reasonable alternative standard and therefore is unlawful is not a factual allegation but a legal conclusion. *Iqbal*, 556 U.S. at 678.[4] Most of the paragraphs in the Complaint are simply restatements or variations of this legal conclusion.

---

[4] The Court recognizes that other district courts have concluded that plaintiffs alleging legal deficiencies in wellness programs' reasonable alternative standards possess Article III standing. But it appears that these cases were either factually distinct or that legal significance was not attached to the distinction between conclusory legal conclusions and well-pled factual allegations for purposes of the Article III standing analysis. *See, e.g., Leslie v. Rentokil N. Am., Inc.*, 2026 WL 950490, at *7 (E.D. Pa. Apr. 8, 2026) ("[T]he Court finds that Plaintiffs satisfy the requirement for Article III standing by plausibly alleging that Rentokil caused them a concrete injury when it imposed a tobacco surcharge that is traceable to Rentokil's decision to impose tobacco surcharges under a discriminatory ERISA plan . . . ."); *Parker v. TTEC Holdings, Inc.*, 826 F. Supp. 3d 1293, 1296–97 (D. Colo. 2026) (finding that plaintiff's payment of $57.69 in allegedly illegal fees every pay period is "a classic pocketbook injury sufficient to give her standing" where plaintiff conclusorily alleged that defendant did not provide a reasonable alternative standard); *Schultz v. Glens Falls Hosp.*, 2026 WL 850332, at *8, *11 (N.D.N.Y. Mar. 26, 2026) ("Defendant, through failure to implement a compliant wellness program, has caused [the plaintiff's] monetary harm, and thus she has suffered a concrete injury in fact under Article III."); *Noel v. PepsiCo, Inc.*, 2026 WL 558118, at *6 (S.D.N.Y. Feb. 27, 2026) ("Plaintiff need not allege that she was specifically impacted by the elements . . . [that rendered the program non-compliant]; the mere fact that Defendants required her to pay a surcharge without offering a compliant program suffices to establish that her injury is traceable to Defendants' unlawful conduct."); *Baker v. 7-Eleven, Inc.*, 2026 WL 473252, at *2 (N.D. Tex. Feb. 19, 2026) ("Baker's injury did not arise from her participation (or non-participation) in the alternative under the Program, but from 7-Eleven's deduction of a $27.70 premium

Once the legal conclusions are set aside, relatively few well-pled factual allegations remain to support Count I: Plaintiff participated in the Plan; he paid a $12.50 weekly tobacco surcharge that was not reimbursed; and Quit for Life provided no retroactive reimbursement.  The facts Plaintiff omits are equally central to the Court's standing analysis:

- Plaintiff does not allege that he completed, enrolled in, attempted to enroll in, or intended to enroll in Quit for Life.

from each of her paychecks.");  *Wilson v. Whole Food Mkt., Inc.*, 2026 WL 196517, at *5 (W.D. Tex. Jan. 20, 2026) ("Defendants imposed a surcharge on Plaintiffs. Plaintiffs allege that the imposition of this surcharge, as carried out by Defendants, is unlawful because it violates ERISA. These allegations are plainly sufficient . . . .");  *Bailey v. Sedgwick Claims Mgmt. Servs. Inc.*, 2025 WL 2779899, at *6 (W.D. Tenn. Sept. 26, 2025) ("For a wellness program . . . to be lawful, it must satisfy all the relevant requirements. . . . So if its program does not meet the relevant requirements, [the defendant] cannot impose a surcharge on tobacco users, which would mean the tobacco surcharge that Plaintiff has been paying is illegal. And with this, Plaintiff alleges an injury-in-fact.");  *Fisher v. GardaWorld Cash Serv. Inc.*, 2025 WL 2484271, at *6 (W.D.N.C. Aug. 28, 2025) ("Assuming Plaintiffs are correct on the merits, they have alleged a concrete injury (their surcharge payments) that is traceable to [the defendant]'s decision to impose tobacco . . . surcharges under a discriminatory ERISA plan, which can be redressed by a refund of the surcharge.");  *Chirinian v. Travelers Cos.*, 2025 WL 2147271, at *5 (D. Minn. July 29, 2025) (finding that plaintiff had standing to challenge allegedly non-compliant wellness program because payment of allegedly unlawful fee counts as a concrete injury for standing purposes);  *Bokma v. Performance Food Grp., Inc.*, 783 F. Supp. 3d 882, 894 (E.D. Va. 2025) ("Plaintiffs' injuries also stand 'fairly traceable' to the Defendant's challenged conduct, because absent Defendant's alleged administration of its non-compliant wellness program, Plaintiffs would not have had to pay an unlawful surcharge.");  *Mehlberg v. Compass Grp. USA, Inc.*, 2025 WL 1260700, at *3 (W.D. Mo. Apr. 15, 2025) (finding that plaintiff had standing to challenge an allegedly non-compliant tobacco cessation program because "[a] statutory right not to be charged . . . cause[s] a particularized injury that affect[s] the class members in a personal and individual way").

17

- Plaintiff does not allege that he would have enrolled in Quit for Life had he been entitled to retroactive reimbursement of tobacco surcharges he already paid.

- Plaintiff does not allege that he would have enrolled in Quit for Life had the Plan provided a means by which he could have avoided the tobacco surcharge for the entire Plan year.

Count II fares no better as the count contains the same statutory recitations and conclusory legal assertions.  Specifically, Plaintiff alleges that the failure to inform "deprives employees of the ability to make informed decisions about their health . . . and imposes an unlawful financial burden on employees . . .."  [Docket No. 1, ¶ 32.] However, the meaning of being able to make "informed decisions" as well as the nature and extent of the alleged "unlawful financial burden" are not clear from the face of the Complaint, making them no more than "[n]aked [factual] assertions" that lack the "further factual enhancement" required to be entitled to the presumption of truth under *Iqbal* and *Twombly*. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

Having disentangled the Complaint's well-pled factual allegations from its statutory recitations and threadbare legal conclusions, the Court turns to the Article III standing analysis as to Counts I and II.

### i.  Count I: Plaintiff Lacks Standing

Construing Count I, the Court finds that Plaintiff alleges that he paid the tobacco surcharges and that Defendant did not reimburse the amounts he paid.  From

those facts, Plaintiff advances the legal theory that ERISA's "full reward" requirement entitled him to retroactive reimbursement of the surcharge.

### a. Injury in Fact

An injury in fact arises from the concrete and particularized invasion of a legally protected interest. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 & n.1 (1992).  In other words, the asserted injury "must affect the plaintiff in a personal and individual way," and must not be "conjectural" or "hypothetical."  *Id.*  Relatedly, "tangible" harms, including physical or monetary harms, readily rise to the level of an injury in fact.  *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021);  *see also Tyler v. Hennepin Cnty.*, 598 U.S. 631, 636 (2023) (finding County's illegal retention of surplus from tax sale was "classic pocketbook injury" sufficient to confer standing).

Taking Plaintiff's factual allegations as true, the Court finds that Defendant's deduction of a tobacco surcharge in the amount of $12.50 from Plaintiff's weekly paycheck, totaling $650 over the course of the Plan year, constitutes an injury in fact.  [Docket No. 1, ¶ 17.]

### b. Traceability and Redressability

Plaintiff, however, cannot establish traceability or redressability.  A concrete and particularized injury must also be fairly traceable to the defendant's challenged conduct.  *The Pitt News v. Fisher*, 215 F.3d 354, 360 (3d Cir. 2000).  The related redressability requirement is satisfied where the plaintiff's injury would be redressed by a favorable judicial decision.  *Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467,

19

481 (3d Cir. 2018) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337– 38 (2016)).  The

plaintiff must demonstrate that redress by a favorable decision is likely, "as opposed

to merely speculative."  *Id.*  (quoting *Finkelman v. Nat'l Football League*, 810 F.3d 187,

194 (3d Cir. 2016)).

Here, Plaintiff does not allege that he participated in Quit for Life or at least

that he would have done so but for the lack of retroactive reimbursement or the

opportunity to avoid any surcharges for the entire Plan year.  This omission is fatal to

Plaintiff's standing because it breaks the causal chain required by Article III.  Plaintiff's

alleged injury cannot be fairly traced to the program's purported deficiencies because

he neither alleges that he sought to avail himself of the course nor that the Plan's terms

deterred him from doing so.

The absence of these facts illustrates why it is necessary for a court to separate

out conclusory legal assertions from well-pled factual allegations when conducting a

standing analysis.  As this Court's syllogism elucidates, Plaintiff effectively alleges that

any wellness program containing a substantive defect under ERISA is invalid, as if it

never existed at all, and thus that any tobacco surcharge imposed under such a

program is discriminatory.  Allowing this type of theory to confer Article III standing

on such a plaintiff would lead to difficult line-drawing questions.  Consider the

following examples: a plaintiff invokes ERISA's requirement that a wellness program

must "promote health" or "prevent disease."  *See* 42 U.S.C. § 300gg-4(j)(1)(A).

Imagine a creative plaintiff who challenges a defendant's wellness program on the

ground that the five-call requirement from its tobacco-cessation course "[is not]

20

reasonably designed to promote health or prevent disease" but that a twenty-call requirement would be. *See id.* Conversely, consider a similarly enterprising plaintiff who attacks a tobacco-cessation course that requires thirty calls as too onerous— making it "an [un]reasonable alternative standard." *See id.* § 300gg-4(j)(3)(D)(i)(I)– (II). Would such plaintiffs have standing to challenge the validity of the entire wellness program absent an allegation that but for the alleged defect they would have enrolled in Quit for Life? This Court thinks not. But an uncritical application of Plaintiff's allegation here would lead to exactly that result—diluting the Article III standing requirement in the process. In sum, the standing inquiry must be directly informed by the well-pled factual allegations supporting the alleged statutory violation.[5]

Even if traceability could be satisfied, Plaintiff has not demonstrated that the possibility of redress by a favorable decision is anything more than "speculative" because—for the reasons examined in detail in the remainder of its Opinion—this Court rejects his merits arguments.[6]

---

[5] It is for this reason that Article III standing prevents a court from deciding whether every conceivable defect in a wellness program renders it unlawful in the abstract. After all, ERISA requires that a program provide a reasonable alternative standard for "an individual" for whom satisfying the otherwise applicable standard is unreasonably difficult because of a medical condition or medically inadvisable. *See id.* § 300gg-4(j)(3)(D)(i)(I) ("[F]or a reasonable alternative standard (or waiver of the otherwise applicable standard) for obtaining the reward for *any individual* for whom, for that period, it is unreasonably difficult due to a medical condition to satisfy the otherwise applicable standard. . ..") (emphasis added). Hence, a plaintiff must allege facts showing that a particular program defect affected him to have Article III standing.

[6] It is not sufficient to conclude that Plaintiff's alleged injury, *i.e.*, payment of the surcharge, is traceable to Defendant's administration of a plan with a wellness

Lastly, there is an additional pleading issue that supports this Court's finding that Plaintiff lacks standing as to Count I: Plaintiff nowhere pleads that he ever used tobacco. This oversight can perhaps be forgiven, since both parties have operated under the assumption that Plaintiff used tobacco during the relevant timeframe. After all, why else would Defendant deduct the surcharge from his weekly paycheck? More concerningly, however, Plaintiff does not allege that he requested or was denied any reasonable alternative standard to which he claims he was entitled. Even accepting Plaintiff's contention that the 2013 Regulations required Defendant to offer him a compliant reasonable alternative standard regardless of any medical condition, the Complaint contains no factual allegations showing that the specific defects he identifies actually affected him.[7]

---

program containing an allegedly defective reasonable alternative standard that Plaintiff never completed or tried to complete. Consider the following analogy to a scenario from everyday life, which hammers home the point. Imagine a shopper who goes to the mall and buys a jacket for $100. Afterwards, he discovers that the store has a loyalty program. Based on the store's terms and conditions, any customer who signs up and completes a short feedback survey will get a $20 discount on *future purchases*. The customer sues the store, alleging that the discount must be made retroactive, even though he never signed up for the rewards program or filled out the feedback survey. Would his monetary injury be traceable to the alleged defect in this rewards program? No. The non-retroactivity of the store's rewards program, which this customer never tried to use, did not *cause* him to lose $20 he might have saved—much less the original $100 he spent.

[7] The Court briefly comments on the Plaintiff's argument that he has statutory standing. For a plaintiff's statutory claim to be judicially cognizable, Congress must have afforded him a cause of action to redress his alleged injury. *See Music Sales Ltd. v. Charles Dumont & Son, Inc.*, 800 F. Supp. 2d 653, 657 (D.N.J. 2009) (quoting *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 295 (3d Cir. 2007)). Plaintiff contends that he has "statutory standing," relying upon 29 U.S.C. § 1132(a)(3). Plaintiff is correct that he has a permissible cause of action under ERISA. [*See* Docket No. 1, ¶¶ 51, 60.] That

Accordingly, for all the foregoing reasons, Plaintiff lacks Article III standing as to Count I.

### ii.  Count II: Plaintiff Lacks Standing

Count II also rests on a narrow set of factual allegations.  Construed generously, Plaintiff alleges that the Plan documents describing Quit for Life and its prospective removal of the tobacco surcharge did not disclose that participants could obtain retroactive reimbursement or that physician recommendations would be accommodated upon request.  Plaintiff contends that these alleged omissions rendered Defendant's notice legally deficient under ERISA.

Because Count II alleges a purely informational injury, namely, the failure to receive adequate notice as spelled out in the preceding sections of this Opinion, Plaintiff must allege specific downstream consequences of that injury.  *See TransUnion*,

---

is to say, he falls within the category of persons authorized to sue under the relevant statutory subsection, and he seeks the relief contemplated by that provision.  *See* § 1132(a)(3) (authorizing participants and beneficiaries to bring civil action enjoining "any act or practice" which, in relevant part, violates "any provision of this [title]," to obtain equitable relief redressing such violation, or to enforce any other part of ERISA).  But Plaintiff is wrong to conflate Article III standing with "statutory standing," since Article III standing is a constitutional prerequisite to this Court's exercise of its jurisdiction.  Thus, just because Plaintiff has a cause of action under federal law does not mean he has Article III standing.  *See TransUnion*, 594 U.S. at 426 (quoting *Spokeo*, 578 U.S. at 341 (a plaintiff does not satisfy "the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.")).  Here, it bears repeating that Plaintiff has made no allegation that he requested or was denied an individualized reasonable alternative standard;  that he suffered from a medical condition making satisfaction of the alternative standard unreasonably difficult; or that it was medically inadvisable for him to attempt to satisfy that standard.

23

594 U.S. at 442. But, as mentioned above, Plaintiff has only alleged that he failed to receive legally required information. He does not plead facts to "demonstrate . . . that the alleged information deficit hindered [his] ability" to avoid adverse consequences. *Id.* Specifically, Plaintiff nowhere alleges that Defendant's failure to notify him in all Plan materials describing the terms of the wellness program that the reward would be available retroactively and that personal physician recommendations would be accommodated affected him, such as by preventing him from enrolling in Quit for Life. In *Plesha*, the court reached the same conclusion. *Plesha v. Ascension Health All.*, 2026 WL 279321, at *7 (E.D. Mo. Feb. 3, 2026) ("Plaintiff's Complaint primarily alleges 'purely informational injur[ies]' that do not satisfy Article III's concreteness requirement. . . . Plaintiff's conclusory claim that the given notice 'deprives employees of the ability to make informed decisions about their health and wellness benefits[]' falls short of alleging a concrete Article III injury. . . . [because] '[n]aked assertions' devoid of 'further factual enhancement' [do not make clear] . . . what exactly an 'informed decision' would result in."). This Court agrees in full with that court's reasoning as to Count II.

Accordingly, the Court **GRANTS** Defendant's Motion to Dismiss Plaintiff's claims in Counts I and II under Federal Rule of Civil Procedure 12(b)(1) for lack of Article III standing.

## B. Plaintiff's Complaint Fails to State a Claim

Having concluded that Plaintiff lacks Article III standing as to Counts I and II, the Court need not reach Defendant's remaining arguments under Federal Rule of

24

Civil Procedure 12(b)(6) for those Counts.  Nevertheless, in the interest of completeness, and because it must resolve Plaintiff's claims under Count III, the Court addresses Defendant's arguments in the alternative.

Before turning to the merits of the Motion, the Court reviews the statutory and regulatory background regarding the ERISA provisions at issue in this case.

### i.  Statutory Background

ERISA applies to "any employee benefit plan if it is established or maintained . . . by any employer engaged in commerce or in any industry or activity affecting commerce[.]"  29 U.S.C. § 1003(a).  Congress enacted ERISA, (codified as amended at 29 U.S.C. §§ 1001–1461), to establish a comprehensive federal framework governing employee benefit plans and "to promote the interests of employees and their beneficiaries in [these] plans." *In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.*, 58 F.3d 896, 901 (3d Cir. 1995) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983)).  ERISA established uniform standards for the administration of employee pension and welfare benefit plans to protect the interests of plan participants.  To that end, ERISA imposed fiduciary duties on plan administrators, required reporting and disclosure, and provided federal causes of action to enforce participants' rights. *See generally* 29 U.S.C. §§ 1001(b), 1002, 1021–1031, 1101–1114, 1132.  Although ERISA initially placed primary focus on pension plans, Congress has amended the statute on numerous subsequent occasions to address related issues affecting employee welfare benefit plans.

### a.  *Prohibiting Discrimination Based on Health-Status Factors*

25

In 1996, Congress passed the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").  HIPAA added two significant provisions to ERISA: (1) a provision prohibiting group health plans from discriminating against participants and beneficiaries based on health-status factors (such as tobacco use);  and (2) a provision stating that the prohibition of such discrimination did not prevent the employer from implementing "premium discounts or rebates or modifying otherwise applicable copayments or deductibles in return for adherence to programs of health promotion and disease prevention."  29 U.S.C. § 1182(b)(1)–(2);  42 U.S.C. § 300gg-4(b)(1)–(2). As amended by HIPAA, Section 702(b) of ERISA provides:

> "A group health plan . . . may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled in the plan on the basis of any health status-related factor in relation to the individual . . .."

29 U.S.C. § 1182(b)(1);  42 U.S.C. § 300gg-4(b)(1).  Section 702(b) further provides:

> "Nothing in paragraph (1) shall be construed—
> (A) to restrict the amount that an employer may be charged for coverage under a group health plan . . . ; or
> (B) to prevent a group health plan, and a health insurance issuer offering group health insurance coverage, *from establishing premium discounts or rebates or modifying otherwise applicable copayments or deductibles in return for adherence to programs of health promotion and disease prevention.*"

29 U.S.C. § 1182(b)(2);  42 U.S.C. § 300gg-4(b)(2)  (emphasis added).

Notably, Congress did not use the term "wellness program" in HIPAA, and, as such, did not incorporate that term into ERISA in 1996.  As discussed, *infra*, the phrase "wellness program" first appeared in the 2001 proposed agency regulations, before

26

being codified in the 2006 final agency regulations (the "2006 Regulations"). 71 Fed. Reg. 75014 (Dec. 13, 2006). In 2010, Congress incorporated the term into ERISA by enacting the Patient Protection and Affordable Care Act, and the Health Care and Education Reconciliation Act (collectively known as the "Affordable Care Act" or "ACA").

The Affordable Care Act amended ERISA to require ERISA-governed health plans to comply with certain provisions of the Public Health Service Act. *See* 29 U.S.C. § 1185d(a)(1) (incorporating 42 U.S.C. § 300gg-4). Those provisions, as relevant here, defined a program of health promotion or disease prevention as a "wellness program" and set forth the statutory requirements that such programs must satisfy to fit the exception to ERISA's prohibition of discriminatory surcharges based on health-status factors. As shown below, Congress adopted the language of the 2006 Regulations almost verbatim. The relevant requirements for a compliant health-contingent, outcome-based wellness program are as follows (and it is the fourth requirement that is primarily at issue in this case):

> *First*, the reward shall not exceed 30 percent of the cost of employee-coverage under the plan and, relevant here, the reward may be in the form of "the absence of a surcharge."

> *Second*, the program "shall be reasonably designed to promote health or prevent disease."

> *Third*, the plan "shall give the individuals eligible for the program the opportunity to qualify for the reward under the program at least once each year."

27

*Fourth*, the "full reward"[8] under the wellness program shall be made available to all similarly situated individuals[9] and to be so available the program must allow "for a reasonable alternative standard . . . for obtaining the reward[10] for any individual for whom . . . it is unreasonably difficult due to a medical condition to satisfy the otherwise applicable standard and for a reasonable alternative standard for obtaining the reward for any individual for whom . . . it is medically inadvisable to attempt to satisfy the otherwise applicable standard."

*Fifth*, the employer must disclose in all plan materials the availability of "a reasonable alternative standard."

*See* 42 U.S.C. § 300gg-4(j)(3)(A)–(E).  The ACA thus struck a balance between two competing objectives: preserving employers' ability to encourage healthier behavior through financial incentives and ensuring that such incentives remain consistent with ERISA's prohibition of discrimination based on health-status factors.

### b.  *Fiduciary Duties under ERISA*

ERISA also regulates the fiduciary duties of plan administrators, requiring them to act in the interest of beneficiaries.  *See* 29 U.S.C. § 1104(a)(1)(A).  In making fiduciary determinations, plan administrators must act with the level of care and prudence due under the circumstances.  *See id*. § 1104(a)(1)(B).  Thus, plan administrators are required to act in accordance with the documents governing the

---

[8] Specifically, the meaning of the phrase "full reward" lies at the heart of the parties' dispute.

[9] The parties do not seem to disagree as to the meaning of "similarly situated individuals" under § 300gg-4(j)(3)(D)(i).  Plaintiff does not argue that Quit for Life is unavailable to any category of Plan participants or that similarly situated participants are treated differently with respect to program access.

[10] The reasonable alternative standard here is Quit for Life.

plan to the extent they are consistent with the statutory requirements. *See id.* § 1104(a)(1)(D). Relatedly, plan administrators are prohibited from dealing with plan assets in a self-interested manner or from representing parties whose interests are averse to the plan's interests. *See id.* § 1106(b)(1)–(2).

### ii. Regulatory Background

As Congress amended ERISA over the years, it delegated varying degrees of rulemaking authority to the Departments of Labor, the Treasury, and Health and Human Services to implement those statutory changes. Because the scope of those delegations evolved with the passage of time, this Court examines each stage of their development.

### a. *The 2006 Regulations*

When Congress enacted ERISA, it delegated power to the Secretary of the Department of Labor ("DOL") to promulgate "such regulations as he finds necessary . . . to carry out . . . [the foregoing]." *See id.* § 1135. Specifically, the text, codified at 29 U.S.C. § 1135, provides:

> Subject to subchapter II and section 1029 of this title, the Secretary may prescribe such regulations as *he finds necessary or appropriate to carry out the provisions of this subchapter*. Among other things, such regulations may define accounting, technical and trade terms used in such provisions; may prescribe forms; and may provide for the keeping of books and records, and for the inspection of such books and records (subject to section 1134(a) and (b) of this title).[11]

---

[11] It is noteworthy that Congress's delegation mentions only certain types of regulations. As noted in the quoted language, Congress expressly contemplated ministerial regulations that would accomplish such prosaic tasks as defining accounting terms, defining technical and trade terms, prescribing forms, and

*Id.*

When Congress amended ERISA by passing HIPAA, it provided a similar delegation of rulemaking authority. Specifically, Congress said:

> "The Secretary . . . may promulgate such regulations *as may be necessary or appropriate* to carry out the provisions of this part."[12]

29 U.S.C. § 1191c (emphasis added).

Based on Congress's directive, in 2006, the DOL, Treasury, and HHS promulgated final regulations regarding "programs of health promotion and disease prevention" which were alluded to, but not defined, in HIPAA.  First, the 2006 Regulations referred to programs of health promotion and disease prevention as "wellness programs."    71 Fed. Reg. at 75017.   Second, the 2006 Regulations established a comprehensive regulatory framework setting forth the conditions under which such programs would not violate ERISA's prohibition against discrimination

---

requiring books and records.  Congress did not, however, authorize the Secretary to create new substantive obligations beyond those contained in the statute.  That fact is relevant to a post-*Loper Bright* analysis, where the court independently determines the best reading of the statute rather than deferring to an agency's interpretation simply because Congress delegated general rulemaking authority.  § 1135 certainly authorizes DOL to promulgate regulations, but it does not answer the question whether a particular regulation—such as one interpreting "full reward"—faithfully implements the statutory text.

[12] HIPAA also required coordination among the agencies and directed that the Secretaries of Labor, Treasury, and HHS coordinate administration and enforcement because Congress enacted substantially identical provisions in ERISA, the Internal Revenue Code, and the Public Health Service Act.

30

based on health-status factors.  The relevant parts of those regulations are set forth in full below:

"(2) *Wellness programs subject to requirements*. If any of the conditions for obtaining a reward under a wellness program is based on an individual satisfying a standard that is related to a health factor, the wellness program does not violate this section if the requirements of this paragraph (f)(2) are met.

(i) The reward for the wellness program, coupled with the reward for other wellness programs with respect to the plan that requires satisfaction of a standard related to a health factor, must not exceed 20 percent of the cost of employee-only coverage under the plan. However, if, in addition to employees, any class of dependents (such as spouses or spouses and dependent children) may participate in the wellness program, the reward must not exceed 20 percent of the coverage in which an employee and any dependents are enrolled. For purposes of this paragraph (f)(2), the cost of coverage is determined based on the total amount of employer and employee contributions for the benefit package under which the employee is (or the employee and any dependents are) receiving coverage. A reward can be in the form of a discount or rebate of a premium or contribution, a waiver of all or part of a cost-sharing mechanism (such as deductibles, copayments, or coinsurance), the absence of a surcharge, or the value of a benefit that would otherwise not be provided under the plan.

(ii) The program must be reasonably designed to promote health or prevent disease. A program satisfies this standard if it has a reasonable chance of improving the health of or preventing disease in participating individuals and it is not overly burdensome, is not a subterfuge for discriminating based on a health factor, and is not highly suspect in the method chosen to promote health or prevent disease.

(iii) The program must give individuals eligible for the program the opportunity to qualify for the reward under the program at least once per year.

(iv) The reward under the program must be available to all similarly situated individuals.

(A) A reward is not available to all similarly situated individuals for a period unless the program allows—

31

(1) A reasonable alternative standard (or waiver of the otherwise applicable standard) for obtaining the reward for any individual for whom, for that period, it is unreasonably difficult due to a medical condition to satisfy the otherwise applicable standard; and

(2) A reasonable alternative standard (or waiver of the otherwise applicable standard) for obtaining the reward for any individual for whom, for that period, it is medically inadvisable to attempt to satisfy the otherwise applicable standard.

(B) A plan or issuer may seek verification, such as a statement from an individual's physician, that a health factor makes it unreasonably difficult or medically inadvisable for the individual to satisfy or attempt to satisfy the otherwise applicable standard.

(v)(A) The plan or issuer must disclose in all plan materials describing the terms of the program the availability of a reasonable alternative standard (or the possibility of waiver of the otherwise applicable standard) required under paragraph (f)(2)(iv) of this section. However, if plan materials merely mention that a program is available, without describing its terms, this disclosure is not required.

*Id.* at 75052.

Notably, the 2006 Regulations divided wellness programs into two general categories: participatory wellness programs and health-contingent wellness programs. 78 Fed. Reg. 33158 (Jun. 3, 2013). The distinction remains in the 2013 Regulations, as discussed below. As relevant here, a participatory wellness program is one under which "none of the conditions for obtaining a reward is based on an individual satisfying a standard related to a health factor or under which no reward is offered." *Id.* at n.5. By contrast, a health-contingent wellness program is one under which "any of the conditions for obtaining a reward is based on an individual satisfying a standard

32

related to a health factor (such as not smoking, attaining certain results on biometric screenings, or meeting targets for exercise)." *Id.* at 33159 n.6. Participatory wellness programs did not have to satisfy the five aforementioned requirements so long as program participation remained available to similarly situated individuals regardless of health status. *Id.* at 33159.

Finally, as relevant here, the 2006 Regulations contained an example of a surcharge that could permissibly be incorporated into a health-contingent wellness program:

> "In conjunction with an annual open enrollment period, a group health plan provides a forum for participants to certify that they have not used tobacco products in the preceding twelve months. Participants who do not provide the certification are assessed a surcharge that is 20 percent of the cost of employee-only coverage. However, all plan materials describing the terms of the wellness program include the following statement: "If it is unreasonably difficult due to a health factor for you to meet the requirements under this program (or if it is medically inadvisable for you to attempt to meet the requirements of this program), we will make available a reasonable alternative standard for you to avoid this surcharge." It is unreasonably difficult for individual F to stop smoking cigarettes due to an addiction to nicotine (a medical condition). The plan accommodates F by requiring F to participate in a smoking cessation program to avoid the surcharge. F can avoid the surcharge for as long as F participates in the program, regardless of whether F stops smoking (as long as F continues to be addicted to nicotine). . . . In this *Example 5*, the premium surcharge is permissible as a wellness program because it satisfies the five requirements of paragraph (f)(2) of this section. First, the program complies with the limits on rewards under a program. Second, it is reasonably designed to promote health or prevent disease. Third, individuals eligible for the program are given the opportunity to qualify for the reward at least once per year. Fourth, the reward under the program is available to all similarly situated individuals because it accommodates individuals for whom it is unreasonably difficult due to a medical condition (or for whom it is medically inadvisable to attempt) to quit using tobacco products by providing a reasonable alternative standard. Fifth, the plan discloses in all materials

33

describing the terms of the program the availability of a reasonable alternative standard. Thus, the premium surcharge does not violate this section."

71 Fed. Reg. at 75045.

### b.  The ACA Substantially Adopted the 2006 Regulations

With the passage of the Affordable Care Act, which adopted the term "wellness programs" and detailed a statutory scheme for such programs that almost mimicked the 2006 Regulations, as discussed *infra*, *see* 42 U.S.C. § 300gg-4(j), Congress's delegation was different.   Unlike the earlier delegation which gave the agencies authority to issue regulations "as may be necessary," Congress authorized DOL, HHS and the Treasury to promulgate implementing regulations "in connection with" the statute.  *See id.* § 300gg-4(n) ("Nothing in this section shall be construed as prohibiting the Secretaries of Labor, Health and Human Services, or the Treasury from promulgating regulations *in connection with this section*.") (emphasis added).   With respect to certain other aspects of the statute, however, Congress gave specific rulemaking authority.  *See, e.g.*, *id.* § 300gg-4(a)(9) (giving the Secretary authority to determine other "appropriate" health status-related factors); § 300gg-4(j)(3)(A) (authorizing rewards up to 50 percent if deemed appropriate by the Secretary).  All told, where Congress saw gaps in the statute, it clearly and conspicuously delegated authority to agencies to fill them in.  At least in this Court's mind, Congress—having reenacted the 2006 Regulations almost verbatim—only saw the need for agencies to issue other regulations in instances like those already mentioned.

### c.  The 2013 Regulations

34

In 2013, the DOL, alongside Treasury and HHS, issued its regulations "in connection" with the amendments to ERISA (the "2013 Regulations"). *See* 78 Fed. Reg. at 33158–59 (establishing requirements for participatory and health-contingent wellness programs); *see also id.* at 33160 (distinguishing between outcome-based and activity-only health-contingent wellness programs). As can be seen from the chart below, the 2013 Regulations added additional provisions not present in the ACA amendments. Importantly, the 2006 Regulations retained the distinction between participatory and health-contingent wellness programs. However, only health-contingent wellness programs had to meet the five requirements spelled out below. *Id.* at 33159. The 2013 Regulations broke new ground by further subdividing the class of health-contingent wellness programs to differentiate between "activity-only" and "outcome-based" health-contingent wellness programs. *Id.* at 33160.

Under an activity-only wellness program, "an individual is required to perform or complete an activity related to a health factor in order to obtain an award . . . [it does] not require an individual to attain or maintain a specific health outcome." *Id.* at 33161. Under an outcome-based wellness program, "an individual must attain or maintain a specific health outcome (such as not smoking or attaining certain results on biometric screenings) in order to obtain a reward." *Id.* The Preamble highlights a number of important differences between the two. For instance, the 2013 Regulations require outcome-based programs, as opposed to activity-only wellness programs, to make a reasonable alternative standard available to anyone who cannot satisfy the otherwise applicable standard, regardless of whether that inability stems from

35

unreasonable difficulty caused by a medical condition. *Id.* at 33160. They also require that any notice of a reasonable alternative standard disclose that personal physician recommendations will be accommodated. *See id.* at 33183.

Finally, most relevant here, although the agencies devoted substantial attention in the 2013 Regulations to rearranging wellness programs into new regulatory classifications, *they never construed the statutory phrase "full reward" to require retroactive reimbursement in certain circumstances*. *See id.* at 33163.

### iii. The Statutory and Regulatory Framework Governing ERISA Wellness Programs

For ease of reference, the above discussion is distilled into the chart below, which summarizes the evolution of the statutory and regulatory framework relevant to the issues before the Court. The takeaway is clear: the 2013 Regulations differ significantly in terms of additions and omissions from the amended statute and the 2006 Regulations on which it relied.

**Comparison Table: Statutory and Regulatory Framework**

Commonalities | | Modifications

| 2006 Regulations | Post-ACA Statute | 2013 Regulations |
|---|---|---|
| "A reward can be in the form of a discount or | "Nothing in paragraph (1) shall be construed— . . . (B) to prevent a group health plan, and a health insurance issuer . . . from establishing premium discounts or rebates or | "[R]eferences . . . to an individual obtaining a reward include both obtaining a reward (such as a discount or rebate of |

| | | |
|---|---|---|
| rebate of a premium or contribution, a waiver of all or part of a cost-sharing mechanism (such as deductibles, copayments, or coinsurance), the absence of a surcharge, or the value of a benefit that would otherwise not be provided under the plan." 71 Fed. Reg. at 75044. | modifying otherwise applicable copayments or deductibles in return for adherence to programs of health promotion and disease prevention." 29 U.S.C. § 1182(b)(2)(A)–(B). | a premium or contribution, a waiver of all or part of a cost-sharing mechanism, an additional benefit, or any financial or other incentive) and avoiding a penalty (such as the absence of a premium surcharge or other financial or nonfinancial disincentive)."  78 Fed. Reg. at 33181. |
| "The reward under the program must be available to all similarly situated individuals." *Id.*<br><br>"A reward is not available to all similarly situated individuals for a period unless the program allows—<br><br>[1] A reasonable alternative standard (or waiver of the otherwise applicable standard) for obtaining the reward for any individual for whom, for that period, it is unreasonably difficult due to a medical condition to satisfy the otherwise applicable standard; and | "The full reward under the wellness program shall be made available to all similarly situated individuals."  42 U.S.C. § 300gg-4(j)(3)(D).<br><br>"The reward is not available to all similarly situated individuals for a period unless the wellness program allows—<br><br>[1] [F]or a reasonable alternative standard (or waiver of the otherwise applicable standard) for obtaining the reward for any individual for whom, for that period, it is unreasonably difficult due to a medical condition to satisfy the otherwise applicable standard; and | "The full reward under the outcome-based wellness program must be available to all similarly situated individuals." *Id.* at 33183.<br><br>"[A] reward under an outcome-based wellness program is not available to all similarly situated individuals for a period unless the program allows—<br><br>[A] reasonable alternative standard (or waiver of the otherwise applicable standard) for obtaining the reward for any individual who does not meet the initial standard based on the measurement, test, or screening, as described in |

37

| | | this paragraph (f)(4)(iv).” *Id.* at 33183–84. |
|---|---|---|
| [2] A reasonable alternative standard (or waiver of the otherwise applicable standard) for obtaining the reward for any individual for whom, for that period, it is medically inadvisable for the individual to attempt to satisfy the otherwise applicable standard.” *Id.* | [2] for a reasonable alternative standard (or waiver of the otherwise applicable standard) for obtaining the reward for any individual for whom, for that period, it is medically inadvisable to attempt to satisfy the otherwise applicable standard.” *Id.* § 300gg-4(j)(3)(D)(i)(I)–(II). | [removed.] |
| “The plan or issuer must disclose in all plan materials describing the terms of the program the availability of a reasonable alternative standard (or the possibility of waiver of the otherwise applicable standard) required under paragraph (f)(2)(iv) of this section.” *Id.* | “The plan or issuer involved shall disclose in all plan materials describing the terms of the wellness program the availability of a reasonable alternative standard (or the possibility of waiver of the otherwise applicable standard) required under subparagraph (D).” *Id.* § 300gg-4(j)(3)(E). | “The plan or issuer must disclose in all plan materials describing the terms of an outcome-based wellness program, and in any disclosure that an individual did not satisfy an initial outcome-based standard, the availability of a reasonable alternative standard to qualify for the reward . . . including . . . a statement that recommendations of an individual's personal physician will be accommodated.” *Id.* at 33184. |
| “However, if plan materials merely mention that a program is available, without describing its terms, this | “If plan materials disclose that such a program is available, without describing its terms, the disclosure under this | “If plan materials merely mention that such a program is available, without describing its |

| | | |
|---|---|---|
| disclosure is not required." *Id.* | subparagraph shall not be required." *Id.* | terms, this disclosure is not required." *Id.* |
| [Sample language.] "If it is unreasonably difficult due to a medical condition for you to achieve the standards for the reward under this program, or if it is medically inadvisable for you to attempt to achieve the standards for the reward under this program, call us at [insert telephone number] and we will work with you to develop another way to qualify for the reward." *Id.* at 75045. | [No sample language.] | [Sample language.] "If you think you might be unable to meet a standard for a reward under this wellness program, you might qualify for an opportunity to earn the same reward by different means. Contact us at [insert contact information] and we will work with you (and, if you wish, with your doctor) to find a wellness program with the same reward that is right for you in light of your health status." *Id.* at 33186. |

The Preamble to the 2013 Regulations provides, in relevant part: "If a calendar year plan offers a health-contingent wellness program with a premium discount and an individual who qualifies for a reasonable alternative standard satisfies that alternative on April 1, *the plan or issuer must provide the premium discounts for January, February, and*

39

> *March* to that individual."
> *Id.* at 33163.

Having set forth the statutory and regulatory background, the Court turns to the parties' positions.

### iv.  Count I Fails to State a Claim

Plaintiff's primary argument is that the statutory phrase "full reward" requires retroactive relief regardless of whether the tobacco-using Plan participant has completed Quit for Life.  Section 300gg-4(j)(3)(D) provides that "the full reward under the wellness program shall be made available to all similarly situated individuals."  In essence, then, the merits of this case turn on a narrow question of statutory interpretation: did ERISA's use of the phrase "full reward" mandate reimbursements for Plan participants completing the reasonable alternative standard—Quit for Life— such that participants can avoid tobacco surcharges for the full Plan year?  The Court answers in the negative based on an examination of the plain meaning of the statutory text, read in context, as well as the relevant regulatory framework.

### a.  *The Plain Meaning of the Statutory Text Supports Defendant's Reading*

"Statutory interpretation, as we always say, begins with the text." *Fischer v. Fed. Express Corp.*, 42 F.4th 366, 375 (3d Cir. 2022) (quoting *Ross v. Blake*, 578 U.S. 632, 638 (2016)).  Accordingly, this Court begins by interpreting the word "full" from the relevant phrase "full reward."  When a statutory term like "full" is left undefined, a court must give it its "ordinary meaning."  *United States v. Poulson*, 871 F.3d 261, 269

n.7 (3d Cir. 2017) (citing *United States v. Santos*, 553 U.S. 507, 511 (2008); *Cadapan v. Att'y Gen.*, 749 F.3d 157, 161 (3d Cir. 2014)).  In the Third Circuit, courts may consult "legal and general dictionaries to ascertain the ordinary meaning of [such] a term."  *Id.* (citing *Pa. Dep't of Pub. Welfare v. U.S. Dep't of Health & Human Servs.*, 647 F.3d 506, 511 (3d Cir. 2011)).  As a matter of plain meaning, the adjective "full" can be understood to mean "[c]omplete in . . . extent"—in other words "whole."  *Full* (adj., sense A.6.a), Oxford English Dictionary, https://www.oed.com (last visited July 22, 2026).  By using the word "full" to modify "reward," Congress only required that a person who satisfies the reasonable alternative standard be eligible for the *same* reward made available to an individual who satisfies the wellness program's applicable health standard.  In other words, the adjective "full" guarantees parity in the ultimate reward: it ensures, for example, that Defendant does not give an employee who completes Quit for Life a lesser reward (*e.g.*, a partial surcharge) than an employee who was tobacco-free from the start.  It does not speak to the reward's nature, value, timing, or retroactive-versus-prospective operation.  In fact, the 2013 Regulations that Plaintiff relies so heavily upon confirm this reading: "Contact us . . . and we will work with you . . . to find a wellness program with the *same* reward that is right for you in light of your health status."  78 Fed. Reg. at 33186.  It would have been quite anomalous

41

for DOL to use "full reward" and "same reward" interchangeably if it intended them to convey different meanings.[13]  *Id.* at 33181 (emphasis added).

Not only is Plaintiff's proposed reading inconsistent with "full" when that word is considered in isolation, it "flouts a 'fundamental canon of statutory construction': that 'the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'"  *United States v. Miller*, 604 U.S. 518, 533 (quoting *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989)).  Nowhere in the statutory text do the words "retroactive" or "reimbursement" appear.[14]  The absence of statutory language suggesting that Congress intended to mandate retroactive relief is significant. In fact, reading "full reward" to require reimbursements where Plan participants have not availed themselves of the reasonable alternative standard would be inconsistent with Section 300gg-4(b)(2)(B), which provides that nothing in the statute should be

---

[13] So, for example, if the default reward for non-tobacco users is a fifty-percent discount, a plan sponsor could not provide only a forty-percent discount to a smoker who completes the applicable tobacco-cessation course.

[14] When Congress incorporated the PHSA into ERISA, it legislated against the backdrop of the 2006 Regulations, which expressly authorized partial-year rewards. 71 Fed. Reg. at 75037 (finding permissible program in which "F can avoid the surcharge for as long as F participates in the [tobacco cessation] program, regardless of whether F stops smoking.").  While the 2006 Regulations were superseded by the 2013 Regulations, Example 5 remains highly persuasive as to the appropriate interpretation of the current statutory scheme because Congress closely followed the language of the 2006 Regulations in amending the statute in 2010.  The "for as long as" language contained in Example 5, however, raises another issue worth noting that neither party addressed in the pleadings, namely, whether or not an employer can impose tobacco surcharges while tobacco-cessation program participants are enrolled in the program, even if they have not yet completed it.  Because no party has raised this issue, however, the Court need not expand on its review of this language.

42

construed "to prevent a group health plan . . . from establishing premium discounts *or* rebates . . . for *adherence* to programs of health promotion and disease prevention." *Id.* § 300gg-4(b)(2)(A)–(B) (emphasis added).

To begin, Congress authorized group health plans to establish "premium discounts *or* rebates . . . ." *Id.* § 300gg-4(b)(2)(B). The use of the disjunctive "or"—as opposed to the conjunctive "and"—indicates that Congress wanted to afford plan sponsors multiple permissible methods of rewarding wellness program participants. "Reimbursement" is encompassed by the ordinary meaning of the word "rebate," which refers to "a *return* of part of a payment, serving as a discount or reduction" or "an amount of money *that is paid back* when someone has overpaid." *Rebate*, Black's Law Dictionary (12th ed. 2024) (emphasis added). Thus, construing "full reward" to mandate reimbursement for higher premiums paid in earlier months of the plan year would write out Congress's careful use of such language, which expressly permits employers to choose whether to provide a discount *or* a rebate. *See* § 300gg-4(b)(2)(B).

But there is another fundamental textual problem with Plaintiff's reading of "full reward." Section 300gg-4(b)(2)(B) expressly conditions the availability of "discounts or rebates" upon "adherence" to a wellness program. "Adherence" means compliance or agreement with a particular standard or set of rules. *Adherence*, Black's Law Dictionary (12th ed. 2024). In simple terms, an individual can only obtain a prospective discount or a retrospective rebate, if offered, when he complies with his employer's wellness program (*i.e.*, by completing Quit for Life).

This statutory interpretation is faithful to Congress's incentive-based structure. Under Plaintiff's interpretation, a tobacco-using employee could wait until the very end of the Plan year, decide to participate in and complete Quit for Life, and thereupon recover all of the surcharges paid in the preceding eleven months of the Plan year. This reading would substantially disserve Congress's goal of promoting health and preventing disease.[15]  Interpreting "full reward" to give plan sponsors discretion whether to provide a retroactive rebate or a prospective discount, as this Court has, preserves both the statutory prohibition against health-status discrimination and the incentive-based structure Congress authorized through the wellness program scheme.[16]

---

[15] In fact, the DOL has explained that "[n]othing . . . prevents a plan or issuer from allowing rewards (including pro-rated rewards) for mid-year enrollment in a wellness program for [a] plan year" as long as participants are afforded the opportunity to meet the reasonable alternative standard when open enrollment occurs. U.S. Dep't of Labor, *Affordable Care Act Implementation FAQs Part XVIII*, at 6 (Jan. 9, 2014) (Question 8), https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/faqs/affordable-care-act-implementation-faqs-part-xviii-mental-health-parity.pdf.  Relatedly, Plaintiff's contention that participants must have the opportunity to avoid the surcharge during the Plan year for which they are seeking reduced premiums is difficult to reconcile with both the statute and the regulation, which require only that a participant be given the chance to qualify "at least once per year." *See id.* § 300gg-4(j)(3)(C); *accord* 29 C.F.R. § 2590.702(f)(4)(i).

[16] This Court's interpretation of "full reward" has been embraced by several of its sister courts. *See, e.g.*, *Parker*, 2026 WL 917789, at *5 ("The plain text of the statute recognizes that a reward may be 'a discount or rebate of a premium . . . [full] means only that the plan must offer the same reward to those pursuing the alternative.'"); *Williams v. Bally's Mgmt. Grp., LLC*, 813 F. Supp. 3d 263, 279 (D.R.I. 2025) ("[T]he Court declines to read a retroactive reimbursement requirement into the meaning of 'full reward'" because "'discount . . . of a premium' and 'absence of a surcharge' provided in [the statute] as possible rewards do not mandate a retroactive reimbursement of previously paid surcharges."); *Plesha*, 2026 WL 279321, at *5 ("In

Finally, the following point is worth noting: Plaintiff alleges in his Complaint that there must be a way for the participants to avoid the surcharge for the full Plan year, and that, because there is not one here under the Plan, participants are not afforded a full reward in violation of ERISA. According to Defendant, however, the Plan affords participants a way to avoid having to pay any surcharges at all before the Plan year begins. All participants can enroll in and complete Quit for Life during open enrollment the year before (*e.g.*, 2025) and if they do so they can avoid any tobacco surcharges for the upcoming Plan year (*e.g.*, 2026). If within that following Plan year (*e.g.*, 2026) a participant uses tobacco, he has an opportunity during that year's open enrollment to enroll in and complete Quit for Life before the next Plan year (*e.g.*, 2027) to avoid any tobacco surcharges. Plaintiff does not seem to dispute these facts at this pleading stage but nonetheless argues that, even if true, Defendant is "violating the requirement that plans offer participants at least the genuine opportunity each plan year to qualify for the full reward." [Docket No. 33, at 34 n.16.][17] But if a participant can avoid any surcharge by enrolling and completing Quit for Life during open enrollment, then under the Plan he will not be issued any surcharges for the upcoming Plan year. If within that Plan year he uses tobacco, he again has an opportunity during

---

short, [the statute] does not impose a retroactive reimbursement requirement for tobacco cessation surcharges."); *Noel*, 2026 WL 558118, at *10 ("As a threshold matter, the Court is not convinced that the 'full reward' requirement entitles participants . . . to an amount reflective of the entire Plan year.").

[17] Recall that the Plan "shall give individuals eligible for the program the opportunity to qualify for the reward under the program at least once each year." *See* 42 U.S.C. § 300gg-4(j)(3)(C).

that year's open enrollment to enroll and complete Quit for Life before the next Plan year. In short, nothing in the Complaint plausibly suggests that the Plan fails to provide employees with a means of avoiding tobacco surcharges for an entire Plan year.

### b. *The Regulations Do Not Support a Contrary Reading*

In the face of this plain meaning, Plaintiff raises three arguments involving the 2013 Regulations. First, Plaintiff implies that the Preamble has the force of law by relying on it as dispositive of the meaning of "full reward" as used in the body of the 2013 Regulations. The Preamble provides: "If a calendar year plan offers a health-contingent wellness program with a premium discount and an individual who qualifies for a reasonable alternative standard satisfies that alternative on April 1, *the plan or issuer must provide the premium discounts for January, February, and March* to that individual." *See* 78 Fed. Reg. at 33163 (emphasis added). Second, conceding that the Preamble may not carry the force of law, Plaintiff contends that DOL's interpretation of the 2013 Regulations in *Sec'y of Lab. v. Macy's Inc.*, 2021 WL 5359769 ("*Macy's I*") (S.D. Ohio Nov. 17, 2021) should control this Court's understanding of the meaning of the 2013 Regulations, thereby invoking *Auer* deference. Third, whether the Preamble is treated as part of the 2013 Regulations or not, Plaintiff argues that *Loper Bright* does not preclude the Court from deferring to DOL's interpretation of "full reward" as that phrase is used in the underlying statute. [Docket No. 47, at 8–9, 11–12.] The Court addresses each argument in turn.

46

### 1. *Preambles Lack the Force of Law.*

The Court starts with the relevant principles of background law, the most important of which is the following: regulatory preambles generally do not carry the force of law and "have no binding effect . . .." *See Safeco Ins./Liberty Mut. Surety v. Dir., Off. of Workers' Comp. Programs*, 103 F.4th 1285, 1289 (7th Cir. 2024); *see also Noel*, 2026 WL 558118, at *9 n.8 (citing *Seife v. U.S. Dep't of Health & Hum. Servs.*, 440 F. Supp. 3d 254, 275 (S.D.N.Y. 2020); *Saunders v. City of N.Y.*, 594 F. Supp. 2d 346, 355 (S.D.N.Y. 2008), *reconsideration denied*, 2009 WL 90621 (S.D.N.Y. Jan. 13, 2009) ("[T]he Preamble to the [2013] Regulations does not have the force of law.")).  This is because they have not gone through the full notice-and-comment rulemaking process.  "With limited exceptions, when an agency wants to promulgate a legislative rule, it must first be published as a proposed rule in the Federal Register . . . and interested persons must be given an opportunity to submit 'written data, views, or arguments with or without opportunity for oral presentation.'" *In re Wedblad*, 2012 WL 245967, at *6 (Bankr. D. Or. Jan. 25, 2012) (citing 5 U.S.C. §§ 553(b)–(c)).  Accordingly, to the extent Plaintiff alleges that the Preamble's understanding of "full reward" is part of the regulation and therefore potentially entitled to deference as dispositive of the meaning of the statute, the Court disagrees.

### 2. *DOL's Interpretation of the 2013 Regulations Based on the Preamble Would Not Enjoy Deference.*

Acknowledging in the alternative that the Preamble does not enjoy the force of law, Plaintiff argues that it nonetheless should inform this Court's understanding of what "full reward" means as that term is used in the body of the 2013 Regulations. Plaintiff relies upon *Macy's I*—which involved DOL's challenge to a similar tobacco surcharge scheme. In that matter, DOL interpreted "full reward" as used in the body of the 2013 Regulations in harmony with the retroactivity principle embodied by the Preamble. *Macy's I* at *3, *16. The *Macy's I* court found DOL's view persuasive. Now Plaintiff asks this Court to defer to DOL's reading of the regulations.

The Court declines to do so. It is true that the *Auer* Court held that reviewing courts must defer to agencies' reasonable interpretations of their own regulations. *Kisor v. Wilkie*, 588 U.S. 558, 563 (2019) (citing *Auer v. Robbins*, 519 U.S. 452, 457–58 (1997)). But in *Kisor v. Wilkie*, the Court substantially limited the application of *Auer* deference. *Id.* After *Kisor*, a reviewing court should only defer to an agency's reasonable interpretation of its own regulation where that court finds the regulation genuinely ambiguous after "resort[ing] to all the standard tools of interpretation."[18]

---

[18] Even then, the agency's interpretation would not receive automatic deference. *Id.* When "countervailing reasons outweigh" the considerations underlying *Auer* deference, the reviewing court should not apply the doctrine. *Id.* at 573. Specifically, *Auer* deference should not come into play if the reviewing court finds that the interpretation's character and context do not entitle it to controlling weight. *Id.* at 576. The *Kisor* Court offered multiple factors to inform a reviewing court's decision whether an interpretation is entitled to controlling weight. *Id.* at 577. First, the regulatory interpretation under consideration must represent the agency's "authoritative" position, not a mere "ad hoc" statement. *Id.* Second, the agency's interpretation "must in some way implicate its substantive expertise." *Id.* This means that an agency's interpretation is not entitled to deference where the agency

48

*Id.* at 573. Importantly, even if genuine ambiguity remains, the Supreme Court has still expressed skepticism toward applying *Auer* deference where the underlying regulation "does little more than restate the terms of the statute itself." *See Gonzales v. Oregon*, 546 U.S. 243, 257 (2006).

Here, for the same reasons discussed in the portion of this Opinion devoted to statutory interpretation, the Court finds no genuine ambiguity in "full reward" as used in the body of the 2013 Regulations—meaning *Auer* deference does not apply at the threshold. However, even if there were genuine ambiguity, *Auer* deference still would not be appropriate because the 2013 Regulations, albeit to a lesser extent than the 2006 Regulations, mirror the language of the statute, thereby triggering the anti-parroting doctrine. This is because "[a]n agency does not acquire special authority to interpret its own words when, instead of using its expertise and experience to formulate a regulation, it has elected merely to paraphrase the statutory language." *Id.* And even if the anti-parroting doctrine did not apply here, DOL's view of the matter—as asserted for the first, and to this Court's knowledge only, time in the *Macy's I* litigation—would not enjoy *Auer* deference because an agency's "ad hoc" litigating position, *i.e.*, one not regularly asserted in litigation over a number of years,

---

has "no comparative expertise" in addressing the ambiguity. *Id.* at 578. Third, an agency interpretation must reflect its "fair and considered judgment," meaning it must not be merely a convenient litigating position or an interpretation causing "unfair surprise to regulated parties." *See id.* at 579. An agency's interpretation may cause unfair surprise where it conflicts with a previous agency interpretation. *See id.*

49

cannot be emblematic of its "considered judgment." *See Kisor*, 588 U.S. at 579.

Accordingly, the Court declines to read the retroactivity principle embodied in the

Preamble into the text of the 2013 Regulations.[19]

### 3. Even if the Preamble Were Part of 2013 Regulations, They Would Not Enjoy Deference Under Loper Bright.

Finally, even if the Court *did* treat the Preamble as part of the 2013

Regulations, the regulations still would not be entitled to deference as representative

of DOL's interpretation of ERISA.  Defendant relies on *Loper Bright Enters. v.*

*Raimondo*, 603 U.S. 369 (2024) and urges the Court to exercise independent

judgment in interpreting the statutory text.  [*Id.*]  Plaintiff counters that *Loper Bright*

does not eliminate the concept of administrative deference, and that the Court should

be hesitant not to defer to the 2013 Regulations because they were promulgated

"under explicit congressional direction after multiple rounds of notice-and-comment

[rulemaking]."  [Docket No. 50, at 13.]

In *Loper Bright*, the Court overruled *Chevron U.S.A. Inc. v. NRDC, Inc.*, 467 U.S.

837 (1984).  *See Loper Bright*, 603 U.S. at 377–78, 412–13.  Under *Chevron*, reviewing

courts had to defer to "permissible" agency interpretations of genuinely ambiguous

---

[19] *Mehlberg*, 2025 WL 1260700, at *5, and *Bokma*, 783 F. Supp. 3d at 905 n.9, both found that *Auer* deference required recognition of the preamble language as dispositive.  However, the anti-parroting doctrine was not at issue in either case.  *See Williams*, 813 F. Supp. 3d at 277 (citing *Buescher*, 791 F. Supp. 3d at 905–06 (finding *Auer* deference inapplicable and noting that *Mehlberg* and *Bokma* did not apply anti-parroting doctrine)).

statutes administered by those agencies.[20]  *Id.* at 378.  After *Loper Bright*, however, "courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority."  *Id.* at 412.  Congress may still delegate discretionary authority to administrative agencies, subject to constitutional limits.  *Id.* at 404.  But even when Congress authorizes an agency to exercise "a degree of discretion," the reviewing court is nevertheless obligated to independently determine the scope of that delegation through ordinary tools of statutory construction.  *See id.* at 395.  While agency interpretations of ambiguous statutory language in their governing statutes are no longer binding, they may still be entitled to respect.  *See id.* at 394–95 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).[21]

For all the reasons mentioned in the preceding section of its Opinion, the Court finds the language of the statute unambiguous.  "Full reward" does not mandate reimbursement for higher premiums already paid during the Plan year.  Accordingly, the Court respectfully declines to defer to the DOL's 2013 Regulations, whether they

---

[20] More recently, in *McLaughlin,* the Court determined that the Hobbs Act does not require district courts to follow agency legal interpretations in enforcement proceedings.  *See McLaughlin,* 606 U.S. at 149.  The Court reaffirmed the following default rule from *Loper Bright*: "District courts are not bound by the agency's interpretation, but instead must determine the meaning of the law under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation."  *Id.* at *155* (citing *Loper Bright*, 603 U.S. at 402).  In other words, Congress must speak clearly to preclude judicial review of an underlying regulation in enforcement proceedings.  *See id.* at 159.

[21] Importantly, *Loper Bright* did not disturb *Kisor's* cabining of *Auer* deference.  *See Loper Bright*, 603 U.S. at 401–02 (citing *Kisor*, 588 U.S. at 578).

are understood to incorporate the Preamble or DOL's Preamble-inspired interpretation. Thus, for all the foregoing reasons, even assuming Plaintiff had Article III standing, the Court **GRANTS** Defendant's 12(b)(6) Motion to Dismiss as to Count I without prejudice.

### v.  Count II Fails to State a Claim

Plaintiff also asserts that Defendant violated ERISA's notice requirements. 42 U.S.C. § 300gg-4(j)(3)(E) provides that "the plan . . . involved shall disclose in all plan materials describing the terms of the wellness program the availability of a reasonable alternative standard . . . ." *See* 42 U.S.C. § 300gg-4(j)(3)(E).[22]  Plaintiff claims that Defendant's notice was inadequate (1) because it did not notify readers in all Plan materials of the availability of a compliant reasonable alternative standard and (2) because it did not state in Plan materials that personal physician recommendations would be accommodated. [Docket No. 1, ¶¶ 4, 28, 29.]  To the extent this claim rests on the proposition that Defendant failed to notify participants of the availability of a reasonable alternative standard providing retroactive reimbursement, it fails. For the reasons above, ERISA does not mandate retroactive relief and therefore notice of the same.

Plaintiff's second contention that the notice was inadequate because it did not disclose that personal physician recommendations would be accommodated fails for

---

[22] That section further provides that "if plan materials disclose that such a program is available without describing its terms, the disclosure . . . shall not be required."  *See id.* § 300gg-4(j)(3)(E).

similar reasons.[23]   While this requirement was included in the body of the rule, as opposed to the Preamble, for the reasons set out in the portion of the Opinion analyzing *Loper Bright*, it cannot easily be harmonized with the statutory text, which speaks in terms of "availability."  *Compare* 78 Fed. Reg. at 33183 *with* 42 U.S.C. § 300gg-4(j)(3)(E).[24]   The 2013 Regulations carved language relating to notice that personal physician recommendations will be accommodated out of whole cloth without a statutory foothold.  Thus, even assuming Plaintiff had Article III standing, the Court **GRANTS** Defendant's Motion to Dismiss Count II without prejudice.

### vi.   Count III Fails to State a Claim

Finally, Plaintiff alleges in Count III that Defendant breached its fiduciary obligations under ERISA.  In particular, Plaintiff factually alleges that Defendant unlawfully assessed and collected unlawful tobacco surcharges.  Defendant retained these monies and enriched itself at the expense of the Plan.  Plaintiff's claims of breach still fail to state a claim, for the reasons discussed previously, because the Plan meets

---

[23] *See United States v. Adair*, 38 F.4th 341, 359 (3d Cir. 2022) (recognizing that a regulation cannot contradict a statute by introducing a new requirement).

[24] Other courts to address similar disclosure claims did not address Defendant's arguments with respect to the inconsistencies between the statute and the 2013 Regulations.  *Mehlberg*, 2025 WL 1260700, at *6, and *Fisher*, 2025 WL 2484271, at *8, primarily considered whether the notices met the requirements imposed by the 2013 Regulations.  Similarly, *Bokma* emphasized *Mehlberg* without discussing the issue in more depth.  *Bokma*, 783 F. Supp. 3d at 906–907.  *Buescher*, 791 F. Supp. 3d at 907, declined to pass on a similar claim because the defendant did not address it.  *Chirinian*, 2025 WL 2147271, at *10, took a similar approach because briefing on the issue was deemed inadequate.

all of the aforementioned statutory and regulatory requirements. Accordingly, the Court **GRANTS** Defendant's Motion to Dismiss Count III without prejudice.

## VI.   CONCLUSION

For the foregoing reasons, the Rule 12(b)(1) Motion to Dismiss is **GRANTED** and the Rule 12(b)(6) Motion to Dismiss is **GRANTED**.  Accordingly, the Complaint is **DISMISSED without prejudice** for the reasons set forth herein.

**s/Renée Marie Bumb**
RENÉE MARIE BUMB
Chief United States District Judge

DATED: <u>July 22, 2026</u>

54